**PHILADELPHIA CO. et al. v. SECURI-
TIES AND EXCHANGE COMMISSION.**

**STANDARD GAS AND ELECTRIC CO. v.
SECURITIES AND EXCHANGE
COMMISSION.**

Nos. 9961, 9962.

United States Court of Appeals
District of Columbia Circuit.

Argued May 19, 1949.

Decided Oct. 10, 1949.

Mr. H. Eastman Hackney, Pittsburgh, Pa., with whom Messrs. Robert J. Dodds, Jr., Pittsburgh, Pa., Helmer Hansen, Chicago, Ill., Howard M. Swartz, and Philip A. Fleger, Pittsburgh, Pa., were on the briefs, for petitioners.

Mr. Louis Loss, Associate General Counsel, Securities & Exchange Commission, Washington, D. C., with whom Mr. Roger S. Foster, General Counsel, Securities & Exchange Commission, Washington, D. C., was on the brief, for respondent.

Mr. William L. Fox, Philadelphia, Pa., filed a brief for Roman Olesnicki, Frederick Peirce, Jr., and William A. McCormick, Jr., acting as the Protective Committee of Public Holders of No Par Value Common Stock of Philadelphia Company.

Mr. W. Howard Dilks, Jr., Philadelphia, Pa., filed a brief for Philadelphia Company 6% Cumulative Preferred Stockholders Protective Committee.

Mr. Charles I. Thompson, Philadelphia, Pa., filed a brief for Roderick G. Kellett, George F. Tyler, Jr., and Robert S. Ingersoll, Jr., acting as Philadephia Company Common Stockholders Protective Committee.

Before EDGERTON and PROCTOR, Circuit Judges, and H. CHURCH FORD, District Judge sitting by designation.

EDGERTON, Circuit Judge.

These petitions present for review orders of the Securities and Exchange Commission directing petitioner Philadelphia Company to dispose of certain gas and transportation interests, and to liquidate and dissolve, and directing petitioner Standard Gas and Electric Company to cause it to do so. Both these petitioners are registered holding companies under the Public Utility Holding Company Act of 1935. 49 Stat. 803, 15 U.S.C.A. § 79a et seq.

Philadelphia Company (Philadelphia) is in the middle of a large holding-company pyramid. It is a subsidiary of Standard Gas and Electric Company. Philadelphia has a number of subsidiaries, the chief of which are Duquesne Light Company, Equitable Gas Company and Pittsburgh Railways Company. Through these subsidiaries Philadelphia controls electric and natural gas properties, a street railway and motor-bus system, and some relatively small non-utility enterprises. The natural gas properties are in Pennsylvania, West Virginia, and Kentucky. The electric and transportation properties and the gas distributing system are in and near Pittsburgh. Management, administrative, and other nonoperating services are performed for Philadelphia's subsidiaries through arrangements called the General Department Organization. The Commission's findings and opinion give a detailed description of the Philadelphia system which we need not repeat.[1]

The Commission held hearings in 1947 to determine what action Philadelphia should take to bring its system into conformity with the integration and corporate-simplification requirements that are the heart of the Public Utility Holding Company Act, Sections 11(b) (1) and 11(b) (2).[2] Section

11(b) (1) makes it the Commission's duty to require each registered holding company and each subsidiary to "take such action as the Commission shall find necessary to limit the operations of the holding-company system of which such company is a part to *a single integrated public-utility system,* and to such *other businesses*[3] as are reasonably incidental, or economically necessary or appropriate to the operations" of the system; *"Provided, however,*[4] That the Commission shall permit a registered holding company to continue to control one or more *additional integrated public-utility systems*[5] if * * * it finds that" certain conditions specified in clauses (A), (B) and (C) are met. Section 11(b) (2) makes it the Commission's duty to require each registered holding company and each subsidiary to "take such steps as the Commission shall find necessary to ensure that the corporate structure or continued existence of any company in the holding-company system does not unduly or unnecessarily complicate the structure, or unfairly or inequitably distribute voting power among security holders, of such holding-company system."

Section 11(e)[6] authorizes holding companies to submit plans for compliance with these requirements. Philadelphia submitted a plan which the Commission found would not comply.[7] The Commission found that the electric properties were one single integrated system and the gas properties another. It held, as it had held repeatedly, that an integrated electric utility system and an integrated gas utility system cannot be "a single integrated public-utility system". It therefore decided that Philadelphia could not keep its gas system (in addition to its electric system) unless it met the cumulative conditions of clauses (A), (B) and (C) of the proviso, under which a hold-

---

1. Holding Company Act Release No. 8242 (June 1, 1948).

2. 49 Stat. 820, 821, 15 U.S.C.A. §§ 79k(b) (1) and 79k(b) (2).

3. Italics added.

4. Italics in Act.

5. Italics added.

6. 49 Stat. 822, 15 U.S.C.A. § 79k(e).

7. Cf. American Power & Light Co. v. Securities & Exchange Commission, 329 U. S. 90, 119–120, 67 S.Ct. 133, 91 L.Ed. 103.

ing company may retain "additional integrated public-utility systems".[8]

No question is raised regarding clauses (B) and (C). The condition of clause (A) is that the Commission find the additional system "cannot be operated as an independent system without the *loss of substantial economies* which can be secured by the retention of control by such holding company of such system."[9] The Commission did not find this to be true of the gas system. It did not find that the transportation system was "reasonably incidental, or economically necessary or appropriate to the operations" of the electric system. It found that without the gas and transportation systems, continued existence of Philadelphia would unnecessarily complicate the structure of the holding-company system. It therefore ordered Philadelphia to dispose of its gas and transportation interests and to dissolve. We stayed enforcement pending review.

█ I. *"Single integrated public-utility system"*. By Section 2(a) (5) of the Act,[10] " 'Public-utility company' means an electric utility company or a gas utility company." By Section 2(a) (29), " 'Integrated public-utility system' means—(A) As applied to electric utility companies, a system consisting of one or more units of generating plants and/or transmission lines and/or distributing facilities * * * physically inter connected or capable of physical interconnection and which under normal conditions may be economically operated as a single interconnected and coordinated system * * * and (B) As applied to gas utility companies, a system consisting of one or more gas utility companies which

are so located and related that substantial economies may be effectuated by being operated as a single coordinated system * * *." [11] Plainly there are two defined types of "integrated public-utility system" and the requirements of the gas type differ from those of the electric type.[12] Just as plainly there is no third type. The Commission rightly refused to formulate a third definition; "(C) As applied to combinations of electric utility companies and gas utility companies * * *." Any such addition to the Act would violate both its terms and its declared policy (Section 1(c) " * * * to compel the simplification of public-utility holding-company systems * * * and to provide as soon as practicable for the elimination of public-utility holding companies except as otherwise expressly provided in this title."[13]

█ Petitioners point out that Section 8 of the Act[14] does not prohibit a holding company from *acquiring* interests in both electric and gas companies serving the same territory, unless the acquisition would violate the law of a State. But Section 8 does not *authorize* any acquisition. And Section 10(c) (1) [15] forbids the Commission to approve any acquisition of securities, assets, or other interests "which is * * * detrimental to the carrying out of the provisions of section 11." An exception in Section 11 authorizes the Commission to permit a holding company to continue controlling two or more integrated public-utility systems (which, by definition, may be either gas or electric) if it finds that specified requirements (A), (B) and (C) are met. But this does not imply that an electric system and a gas system may be a single integrated public-utility system.

8. Philadelphia elected to retain the electric system if it could not retain both.

9. Italics added. Section 11(b) (1) (A), 49 Stat. 820, 15 U.S.C.A. § 79k(b) (1) (A).

10. 49 Stat. 806, 15 U.S.C.A. § 79b(a) (5).

11. 49 Stat. 810, 15 U.S.C.A. § 79b(a) (29).

12. Cf. Arkansas Natural Gas Corp. v. Securities & Exchange Commission, 5 Cir., 154 F.2d 597, 599, certiorari denied 329 U.S. 738, 67 S.Ct. 67, 91 L.Ed. 637.

13. 49 Stat. 804, 15 U.S.C.A. § 79a(c).
 Cf. Report of the National Power Policy Committee on Public-Utility Holding Companies, submitted by the President to Congress and printed as an appendix to the Senate Report on the bill, stating that "Electric utility and interstate gas transmission or production should be divorced from common control." Sen.Rep.No.621, 74th Cong., 1st Sess., 59 (1935).

14. 49 Stat. 817, 15 U.S.C.A. § 79h.

15. 49 Stat. 819, 15 U.S.C.A. § 79j(c) (1).

724

■

■ II. *"Loss of substantial economies".* Petitioners contend that if the combined gas and electric systems are not a single integrated system, the evidence required the Commission to find that the gas system is an "additional" system that "cannot be operated as an independent system without the loss of substantial economies which can be secured by the retention of control by such holding company of such system."[16] Coffman, a witness for petitioners, predicted that segregation would increase the annual operating expense of the gas system by about $500,000, chiefly by eliminating the General Department Organization.[17] The Commission analyzed, criticized, and found defective the methods and assumptions by which the witness arrived at his prediction, including assumptions about the extent to which duplication of personnel would become necessary. The Commission was not convinced that his prediction would prove correct. We cannot say it was unreasonable in not being convinced. "Whether economy is achieved by centralized control is always a doubtful question and one peculiarly fitted for decision by an administrative agency staffed by experts. On such an issue a court cannot review or reweigh the evidence"[18] beyond determining that the finding does or does not appear to be unreasonable. The rule that a specialized agency's findings on a question within its speciality "are not to be disturbed except in the plainest case * * * applies here with especial force just because the findings are necessarily prospective; time alone [could] decide their success or their failure."[19]

■■ Moreover "the mere showing of a material saving in operational expense (which, to some extent at least, would normally be expected) does not necessarily show the overall situation. This single item may or may not indicate a net economy of any figure."[20] The Commission was not convinced that the predicted increase in expense, if it occurred, would not be offset by "compensating advantages." The Commission said: "it is manifestly to the advantage of both the electric and gas businesses that independent managements for each be allowed to devote their entire energies to their respective companies, and that such businesses not continue to have their operations supervised by common management which is also conducting another business in the same area which, at the very least, must be viewed as a potential if not an actual competitor. If, as the company argues, some increase in personnel costs would be incurred on segregation, it is not unlikely that these costs may be offset by the greater productivity which should result from the additional personnel and from the concentration of the energies of all personnel on the single system to which they will then be assigned and to which they will owe undivided allegiance." To petitioners *"these findings are mere theories, based on unsupported conjecture and speculation."* (Their italics.) Petitioners forget that "whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference."[21] Inferences may be drawn from obvious facts not of record. The Commission did not err in assuming (1) that men can give more time, energy, and

16. 49 Stat. 820, 15 U.S.C.A. § 79k(b) (1) (A).

17. He also testified it would increase the expense of the electric system by about $525,000 and of the transportation system by about $98,000.

18. North American Co. v. Securities & Exchange Commission, 2 Cir., 133 F.2d 148, 152; affirmed as to constitutionality, 327 U.S. 686, 66 S.Ct. 785, 90 L.Ed. 945.

19. Learned Hand, J., (for three-judge court) in National Broadcasting Co. v. United States, D.C., 47 F.Supp. 940, 946; affirmed 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344.

20. Engineers Public Service Co. v. Securities & Exchange Commission, 78 U.S. App.D.C. 199, 207, 138 F.2d 936, 944; vacated as moot 332 U.S. 788, 68 S.Ct. 96, 92 L.Ed. 370.

21. Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916.

allegiance to an employer if they give none to his competitor and (2) that, within normal limits, more is better than less.

 Though the formula serves no useful purpose, the Commission did not err in saying that petitioners must prove by "clear and convincing evidence" that the gas system came within the substantial-economies exception in section 11(b) (1).[22] To call the quoted formula erroneous would be to say that unclear and unconvincing evidence may require the Commission to make a positive finding. A fair preponderance of evidence is, by hypothesis, reasonably clear and convincing. Even if the Commission had set up an erroneously high standard of proof no prejudice would have resulted, for the Commission did not think petitioners' case proved by any standard however low.[23]

 The Commission held that even if the predicted increase in operating expense occurred and was uncompensated, in relation to the large gas system here in question it would not be a "loss of substantial economies" as that term is used in the Act. The annual gross revenues of the gas system were over $16,000,000 and the operating expenses over $13,000,000. In the Commission's view, economies are not "substantial" unless their loss "would cause a serious economic impairment of the system" such as to "render it incapable of independent economical operation." The Conference Report that preceded the passage of the Act supports this view. It says Section 11 "makes provision to meet the situation where a holding company can show a real economic need on the part of additional integrated systems for permitting the holding company to keep these additional systems under localized management with a principal integrated system." [24] Before the President approved the Act, though after Congress passed it, Senator Wheeler of the Conference Committee said: " * * * the Senate conferees concluded that the furthest concession they could make would be to permit the Commission to allow a holding company to control more than one integrated system if [among other tests] the additional systems * * * were so small that they were incapable of independent economical operation * * *."[25] "Substantial" is a relative and elastic term. Petitioners concede that economies, to be substantial, must be "important". We cannot say the Commission's understanding of the term "substantial economies" is wrong. We construed it similarly in the Engineers case.[26]

 III. *"Other business."* Implementing the "other business" clause quoted above, Section 11(b) (1) specifies that "The Commission may permit as reasonably incidental, or economically necessary or appropriate to the operations of one or more integrated public-utility systems the retention of an interest in any business (other than the business of a public-utility company as such) which the Commission shall find necessary or appropriate in the public interest or for the protection of investors or consumers and not detrimental to the proper functioning of such system or systems." The Court of Appeals for the Second Circuit has held

---

22. Engineers case, supra note 20, 78 U.S. App.D.C. at page 207, 138 F.2d at page 944.

23. The Commission said the witness Coffman's "approach clearly does not give a true picture of what personnel actually would be required to perform the necessary work for the companies after segregation * * *." The Commission concluded "the evidence does not in fact support respondents' [the present petitioners'] claims and falls far short of establishing that substantial economies would be lost on segregation. With respect to this latter conclusion we find that Coffman's studies are entitled to little or no weight * * *."

24. H.R.Rep.No.1903, 74th Cong., 1st Sess., 71 (1935).

25. 79 Cong.Rec. 14,479 (Aug. 24, 1935); cf. Engineers Public Service Co. v. Securities & Exchange Commission, supra note 20, 78 U.S.App.D.C. at page 205, 138 F.2d at page 942.

26. Supra note 20, 78 U.S.App.D.C. at page 207, 138 F.2d at page 944. Cf. North American Co. v. Securities & Exchange Commission, supra note 18.

that "other businesses" cannot be retained relationship to the integrated public-utility system. North American Co. v. Securities & Exchange Commission, 2 Cir., 133 F.2d 148, at pages 152, 153. This court held the contrary in the Engineers case.[27] But afterwards the Supreme Court in the North American case, though deciding only constitutional issues, said "other holdings may be retained only if their retention is related to the operations of the retained utility properties." North American Co. v. Securities & Exchange Commission, 327 U.S. 686, 697, 66 S.Ct. 785, 792, 90 L.Ed. 945. In the present case the Commission not only found no such relation between the electric utility system and the transporta-

tion business; it was not convinced and therefore did not find that continued common control of the utility system and of the transportation business was necessary or appropriate in the public interest or for the protection of investors or consumers and not detrimental to the proper functioning of the utility system. There was nothing unreasonable in this. The burden of proving the exceptional facts was on petitioners.[28]

The Board duly accorded petitioners a full hearing. There was no lack of due process. We have considered petitioners' other contentions but find no prejudicial error.

Affirmed.

27. Supra note 20. Cf. Arkansas Natural Gas Corp. v. Securities & Exchange Commission, 5 Cir., 154 F.2d 597, certiorari denied 329 U.S. 738, 67 S.Ct. 67, 91 L.Ed. 637.

28. United Gas Improvement Co. v. Securities & Exchange Commission, 3 Cir., 138 F.2d 1010, 1021.