DART CONTAINERLINE COMPANY
LIMITED, Petitioner,

v.

FEDERAL MARITIME COMMISSION
and United States of America,
Respondents,

Sea-Land Service, Inc., Intervenor.

No. 82–1403.

United States Court of Appeals,
District of Columbia Circuit.

Following Remand of the Record
Nov. 29, 1983.

As Amended Dec. 2, 1983.

Edwin Longcope, Washington, D.C., with whom Frederick L. Shreves, II, Washington, D.C., was on the brief, for petitioner.

David R. Miles, Atty., Federal Maritime Com'n, Washington, D.C., with whom C. Jonathan Benner, Gen. Counsel, Robert D. Bourgoin, Deputy Gen. Counsel, and C. Douglass Miller, Atty., Federal Maritime Com'n, Washington, D.C., were on the brief, for respondents. John J. Powers, III and Robert J. Wiggers, Attys., Dept. of Justice, Washington, D.C., also entered appearances for respondents.

Paul J. McElligott, Washington, D.C., for intervenor.

Before ROBINSON and EDWARDS, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge MacKINNON.

MacKINNON, Senior Circuit Judge:

Petitioner Dart Containerline Company, Ltd. ("Dart") appeals from an order of the Federal Maritime Commission (FMC), which conditioned on certain capacity limitations its approval of Dart's proposed agreement substituting a partner in a joint venture operating as a common carrier by water. After hearing oral argument in this case, this Court remanded to the Commission for a full report on whether the agency had properly asserted jurisdiction over Dart's agreement and amendments thereto. Having received and considered the Commission's "Report on Remand" and Dart's objections to that report, the Court is now satisfied that the FMC had jurisdiction in this matter. Because, in effect, petitioner seeks to reverse an FMC order granting petitioner precisely the authority it sought, and because petitioner has acceded to the condition, we affirm the order of the FMC.

## I. BACKGROUND

In 1969, FMC approved Agreement No. 9745 ("the Agreement"), whereunder Dart was created to operate a joint venture[1] in the trades between (1) ports in Eastern Canada and United States North Atlantic ports, on the one hand, and ports in Europe, on the other; and (2) ports in Eastern Canada and United States North Atlantic ports. The scope of the Agreement was subsequently modified (No. 9745-1) by substituting United States South Atlantic ports for Eastern Canadian ports in the transAtlantic service. Another amendment (No. 9745-2) substituted Consolidated Container Service Company, Ltd. ("Consolidated") for Clarke by means of a stock transfer. The parties sought and obtained approval from FMC under section 15 of the Shipping Act of 1916, 46 U.S.C. § 814 (1976 & Supp. V 1981), for both of these amendments to the original Agreement.

A third amendment (No. 9745-3), and the order of FMC granting conditional approval thereto, give rise to this appeal. The amendment substitutes Centennial Shipping, Ltd. ("Centennial"), a subsidiary of Canadian Pacific, Ltd., for Bristol, reflecting thereby Centennial's purchase of all of Bristol's shares in Dart. This substitution occurs at a time when Dart is restructuring its entire service between North America and Europe. Dart no longer intends to call at Canadian ports as an adjunct to its service from United States ports. In addition, Dart will add Charleston as an Atlantic port of call and will continue to offer weekly service in the trade using four new containerships, each with a capacity of 1069 twenty-foot equivalent units ("TEUs"). Dart has transferred its trading rights in Canada to its coventurer Belge, whose subsidiary Dart Containerline (Canada) N.V. ("Dart Canada"), together with Canadian Pacific Steamships Ltd. (another subsidiary of Canadian Pacific, Ltd.) and Manchester Liners, Ltd., will operate a reorganized service from Canada to Europe. There exists, therefore, a commonality of ownership among those carriers involved in Canada and Europe service, on the one hand, and those involved in Dart's contested United States and Europe service, on the other.[2]

Dart informed FMC of the impending stock transfer while maintaining that FMC approval was not required because such transfer was within the authority already granted Dart under the Agreement. FMC disagreed and advised Dart to submit the proposed transfer as an amendment for separate section 15 approval. Dart complied.

Sea-Land Service, Inc. ("Sea-Land"), a competitor of Dart and intervenor herein, protested the amendment because of alleged potential adverse impact on competitive conditions in the North Atlantic/Europe trade. Sea-Land viewed the amend-

---

1. The original parties to the venture were Compagnie Maritime Belge, S.A. ("Belge"), Bristol City Line of Steamships, Ltd. ("Bristol"), and Clarke Traffic Services Ltd. ("Clarke").

2. As noted, Belge is both a coventurer in Dart and a parent of Dart Canada, whose other

parent Canadian Pacific, Ltd. is also the parent of Centennial, the proposed substitute for Bristol. Moreover, Manchester Liners and Consolidated (a Dart coventurer) share common ownership.

ment as but one part of an overall restructuring of Dart service from Canada and the United States to Europe, and it urged the Commission to consider the amendment in that context. While Sea-Land initially requested a full hearing under section 15, it stated that it would agree to approval for *one* year while a hearing was conducted, with a 4276 TEU capacity limitation—equivalent to the combined capacity of the four new containerships Dart proposed to utilize in its restructured service between the United States and Europe.

Dart, in turn, reiterated its contention that approval was not necessary and insisted that the amendment be approved without a hearing. Dart indicated a willingness to accept a *three*-year term and the deletion of its United States-Canada service, but it resisted imposition of capacity limitations.

The Commission rejected Dart's contention that the amendment merely substitutes one party for another; instead, FMC viewed the amendment as "establish[ing] an entirely new joint venture ... [which] is subject to the approval requirements of section 15 ...." FMC also concluded that the new arrangement would be *per se* violative of the antitrust laws absent section 15 approval, but the Commission ruled that transportation and public interest benefits accruing from the agreement outweighed any anti-competitive impact. Accordingly, the Commission rejected Sea-Land's request for a hearing, but did limit Dart's service to its planned capacity of 4276 TEUs. Subject to this condition—plus the two conditions Dart had previously agreed to accept, *see supra*—FMC approved Agreement No. 9745-3 on February 10, 1982. Two months later, Dart's new coventurers filed a revised agreement *accepting the Commission's conditions. See* Appendix A to Brief for Respondent. Sea-Land has not appealed from the order.

Upon appeal, Dart offered three grounds for assailing the agency's decision to impose capacity limitations: that FMC exceeded its authority by presuming to pass on a stock transfer Dart was entitled to effect without FMC approval; that the decision is not supported by substantial evidence; and that the decision was arbitrary and capricious. After hearing oral argument, this Court, acting *sua sponte,* issued an order remanding to the FMC on March 8, 1983. The Court ordered the Commission to provide "a statement for its reasons for asserting jurisdiction over the matter in controversy."

In response to this Court's order, the Commission on May 15, 1983, issued its Order on Remand stating that "[p]roponents of Agreement 9745 and Protestant Sea-Land Service, Inc. may present evidence and argument addressing the question of the Commission's jurisdiction over Agreement 9745 ...." Dart declined the FMC's invitation to participate in the remand proceedings. The Commission filed its "Report on Remand" on September 2, 1983, vigorously defending the FMC's exercise of jurisdiction in this matter. Subsequently, on September 21, 1983, this Court allowed Dart to file a response to the FMC's Report on Remand, notwithstanding Dart's refusal to participate before the Commission.

## II. THE COMMISSION'S JURISDICTION OVER THE DART AGREEMENT

The first issue in this case is necessarily that which this Court remanded to the Commission for a full report: whether the FMC had statutory jurisdiction over Agreement No. 9745, establishing Dart, and amendments thereto. The Commission's "Report on Remand" has convinced us that the FMC had a sufficient factual basis for its assertion of jurisdiction.

■ Preliminarily, it is important that it was Dart itself that invoked the Commission's jurisdiction. While Dart may have initially contended that FMC approval of the stock transfer was not necessary, Dart did ultimately petition for, and receive the agency's approval. Even more importantly, Dart initially invoked the Commission's jurisdiction when it *first* sought approval of Agreement No. 9745 as a shield against the antitrust laws, and when it sought the first two amendments to the Agreement. In a case remarkably similar to that at bar, the Supreme Court held:

[A]ppellant, having invoked the power of the [Interstate Commerce] Commission to approve the transfer of the amended certificate to it, is now estopped to deny the Commission's power to issue the certificate in its present form and as it existed prior to the time the appellant sought its transfer. *United Fuel Gas Co. v. Railroad Comm'n,* 278 U.S. 300, 307–08 [49 S.Ct. 150, 151–152, 73 L.Ed. 390 (1929)]; *St. Louis Malleable Casting Co. v. Prendergast Construction Co.,* 260 U.S. 469 [43 S.Ct. 178, 67 L.Ed. 351 (1923)] . . . The appellant cannot blow hot and cold and take now a position contrary to that taken in the proceedings it invoked to obtain the Commission's approval.

*Callanan Road Improvement Co. v. United States,* 345 U.S. 507, 513, 73 S.Ct. 803, 806, 97 L.Ed. 1206 (1953); *see Admiral Towing Co. v. Woolen,* 290 F.2d 641, 644–45 (9th Cir.1961). Although a party's petition cannot bestow statutory jurisdiction upon an agency, the party's invocation of an agency's jurisdiction may preclude later attacks on that jurisdiction, at least where a colorable basis for jurisdiction exists. In this case, Dart apparently did not deny the Commission's jurisdiction over Agreement No. 9745 until oral argument in this case.[3] Thus under the present circumstances, Dart's attack on the FMC's jurisdiction is launched from a very weak position.

▮ In any event, the Commission has demonstrated adequately that its jurisdiction was well founded. The statutory requirement is as follows:

*Every common carrier by water,* or other person subject to this Act, *shall file* immediately with the Commission a true copy, or, if oral, a true and complete memorandum, of *every agreement with another such carrier* or other person subject to this chapter, *or modification or cancellation thereof, to which it may be a party or conform in whole or in part,* fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement.

46 U.S.C. § 814 (1976 & Supp. V 1981) (emphasis added). The term "common carrier by water" is broadly defined as "a common carrier by water in foreign commerce . . . on regular routes from port to port." 46 U.S.C. § 801 (1976 & Supp. V 1981).

In 1969, Dart first filed Agreement No. 9745 over which the Commission exercised its statutory jurisdiction. The original Agreement, paragraph 1, stated:

Each of the parties to this Agreement is, or will be either in its own name or through its wholly-owned subsidiary, at the time of the operative events hereinafter described, a common carrier by water in the commerce between Europe and/or Eastern Canada and the United States.

Having thereby in 1969 conceded the "common carrier" status of the individual parties to the Agreement, Dart did not attempt to refute the Commission's jurisdiction until this appeal. At no time has Dart provided any evidence, fresh or otherwise, to back up its present claim that the Commission lacks jurisdiction; rather it has preferred to rely upon conclusory statements. Most notably,

---

**3.** The following exchange took place at oral argument:

The Court: To go back to the '69 original arrangement . . . . Did the Commission have authority then?

Mr. Longscope: I said no, it did not.

The Court: All right, why not?

Mr. Longscope: Because the parties involved were mere shareholders in the setting up of a corporation. They were not common carriers, persons subject to the Act. I debated that with the Commission staff and in order that we could get going and do business, we accepted their position and filed the agreement.

Dart held itself aloof from participation in the Commission's inquiry into jurisdiction upon remand.

Dart's basic contention is that "as a single entity (a Bermuda corporation formed by three steamship company shareholders) it was not subject to Commission jurisdiction under Section 15." Dart's Reply to "Report on Remand" at 2. Dart's claim to single-carrier status for section 15 purposes is unconvincing. First, the contention flies in the face of the above-quoted provision of the original Agreement, which conceded the common carrier status of each participant. Second, elementary principles of antitrust law render Dart's legal status as a Bermuda corporation immaterial to its status under statutes regulating competition. *See United States v. Penn-Olin Chemical Co.,* 378 U.S. 158, 168, 84 S.Ct. 1710, 1715, 12 L.Ed.2d 775 (1964); *United States v. Mammoth Oil Co.,* 14 F.2d 705, 729 (8th Cir.1926), *aff'd,* 275 U.S. 13, 48 S.Ct. 1, 72 L.Ed. 137 (1927). The Commission is duty-bound to look beyond the corporate facade to the functional substance of the Dart arrangement. In substance, as opposed to corporate form, Dart is comprised of three carriers acting in concert. By its very terms, paragraph 2(b) of the Agreement forecloses competition among its parties: "[N]one of the parties hereto will act as principal or agent for any competing service in the trade covered herein."

Furthermore, the Commission demonstrated upon remand that evidence on the record supported the FMC's conclusion that two affiliates of the parties to the Agreement, Belge and Consolidated, are presently operating as statutory common carriers by water. The share purchase and shareholder agreements between the Dart parties, as well as paragraph 2(b) of Agreement No. 9745 itself, impose obligations and restrictions upon such affiliates. Thus on the record before the Commission, it was fully justified in concluding that an adequate basis for statutory jurisdiction existed in that Dart involved several carriers.

III.  THE COMMISSION'S AUTHORITY TO IMPOSE CAPACITY LIMITATIONS

■  Dart advances two grounds for its contention that FMC lacked authority to impose capacity limitations: that section 15 does not empower the Commission to impose conditions on an agreement over the objection of the proponents, and that Dart already had been granted authority to effect the stock transfer by approval of the original Agreement. Neither contention has merit.

Section 15 grants FMC express authority to modify agreements which are submitted to it for approval (putting aside, for the moment, the question whether approval of this particular amendment was required):

The Commission shall by order, after notice and hearing, ... modify *any agreement, or any modification or cancellation thereof,* whether or not previously approved by it, that it finds ... to operate to the detriment of the commerce of the United States, or to be contrary to the public interest ....

46 U.S.C. § 814 (1976 & Supp. V 1981) (emphasis added). Accordingly, this Court has held that FMC may modify an agreement to alleviate its anticompetitive effects. *See Sea-Land Service, Inc. v. United States,* 683 F.2d 491, 502–03 (D.C.Cir.1982); *United States Lines, Inc. v. FMC,* 584 F.2d 519, 528 (D.C.Cir.1978) (citing *FMC v. Pacific Maritime Ass'n,* 435 U.S. 40, 53–54, 98 S.Ct. 927, 935–36, 55 L.Ed.2d 96 (1978)).

Against such express authority Dart interposes a series of weak arguments. First, Dart insists that in the past FMC has imposed capacity limitations only in space charter and pooling agreements, *i.e.,* arrangements between shippers who are in direct competition at the time the agreements are filed. But the Commission found—from Dart's *own* evidence—that Centennial was a potential competitor which had considered other less anticompetitive modes of entering the trade. Further, it is difficult to see how FMC's statutory authority to impose conditions can be made to turn on whether Centennial is a present or potential competitor, especially in view

of this court's decision to remand, for failure to consider antitrust consequences, an agreement which would have added a potential competitor as a party to an existing joint venture. *See United States Lines, Inc., supra,* 584 F.2d at 530, 543.

Second, Dart maintains that FMC "has clearly recognized its inability to impose capacity limitations on single carriers." Brief for Petitioner at 12 (footnote omitted) (citing *Agreements Nos. 9902–3, et al. (Modification of Euro-Pacific Joint Service),* 19 S.R.R. (P & F) 141, 146 (1979)). Dart's claim to single-carrier status for section 15 purposes, however, is no more convincing in this respect than in the jurisdictional context.

Third, Dart nonetheless maintains that FMC cannot impose limitations on a section 15 agreement *over Dart's objection.* Technically, this is correct. As the Commission has explained,

> [t]he power to modify is not the power to compel acceptance of the modification. When a new agreement filed for approval comports with the requirements of section 15, save in one or even a number of its provisions, we are empowered to modify the objectionable provisions and condition our approval of the agreement upon the acceptance of those modifications. *Thus, while the parties to the agreement, should they desire to act in concert, must accept the conditions imposed upon their concerted action by the modifications, they are always free to reject the modifications and continue their operations as before.*

*Inter-American Freight Conference—Cargo Pooling Agreements Nos. 9682, 9683 and 9684,* 14 F.M.C. 58, 62 (1970) (emphasis added). Accordingly, the FMC has promulgated a regulation providing that if parties to a conditionally approved agreement do not accept the conditions, the conditional approval becomes null and void and the agreement, as filed, is reconsidered by the Commission. *See* 46 C.F.R. § 522.7 (1982). In fact, Dart *did* acquiesce to the conditions by modifying its agreement to conform to the order. *See* Appendix A to Brief for Re-

spondent. Dart could have continued under its prior organization and sought reconsideration. In that light, Dart's acquiescence has a devastating effect on the position it advances in its present petition.

Finally, Dart continues to maintain that FMC's approval of the original Agreement granted Dart the authority to transfer its stock without FMC approval. *See* Brief for Petitioner at 15–16. Having been granted the authority to organize as a corporation under the original Agreement, Dart insists its proposed sale of stock is now governed by "general principles of corporation law" and that FMC's finding that substituting Centennial would constitute a new entity is "contrary to basic corporate law." *Id.* Again, corporate law is not dispositive where FMC is charged under section 15 with the duty to consider the anticompetitive impact of a proposed exemption from the antitrust laws. Given the commonality of ownership among potential competitors that would result from Dart's restructuring of its North America/Europe service, this is not the "simple amendment" that petitioner would have us shrug off.

Moreover, the statute expressly makes subject to the approval requirements of section 15 "every agreement . . . , or *modification* or cancellation thereof, . . . in any manner providing for an exclusive, preferential, or *cooperative working agreement.*" 46 U.S.C. § 814 (1976 & Supp. V 1981) (emphasis added). With or without a sale or stock, Centennial proposes to enter into a "cooperative working arrangement" with two of Dart's present coventurers. The Shipping Act does not exempt from review arrangements brought about by the operation of Bermuda corporate law. Furthermore, even if the amendment were deemed not subject to section 15, FMC nonetheless may elect to review *the original Agreement* because changes wrought by Centennial's substitution could have anticompetitive consequences. *See Agreements Nos. 8200, et al.,* 19 S.R.R. (P & F) 245 (1979) (prior approval does not create a vested right of approval).

### IV. SUBSTANTIAL EVIDENCE AND REASONABLENESS

As FMC notes in its brief, there was ample evidence provided by petitioner's *own* submissions and witnesses to support imposition of capacity limitations. *See* Brief for Respondent at 22–24. The Commission based its decision to substitute a capacity limitation for the original Agreement's seven-vessel limitation on two factors. First, FMC noted that the original vessel limitation was attached to an agreement which included a Canada and Europe service (now deleted), and a vessel limitation had "no relevance to the present commercial realities in the trade now covered by the [new] Agreement—U.S. to the U.K. and Europe." Second, the Commission found that the proposed capacity of Dart's four vessels, the basis of the FMC's capacity limitation, "does not appear unreasonable" because the vessels would no longer call at any Canadian ports while adding only one new American port of call. Moreover, FMC viewed overtonnage and trade instability as considerations affecting its approval, based in part on the evidence that Dart itself offered to support the existence and relevance of these concerns. FMC not unreasonably concluded that it should grant only such authority as Dart itself maintained would not alter its container capacity. The Commission thereby avoided exacerbating the overtonnage and trade instability problems. In addition, Dart's own submissions from Centennial provide substantial evidence that a potential competitor would be folded into the arrangement.

### V.

The Commission had jurisdiction over Dart's Agreement and the authority to impose the conditions that it did; the agency's resolution was not arbitrary and capricious; nor was substantial evidence wanting. Dart received approval for precisely the tonnage it proposed to utilize. That it now complains about limitations suggests that Sea-Land's suspicions perhaps were not so unfounded. In any case, if Dart decides it must expand its trade, it may seek modification of its Agreement. *See Farrell Lines, Inc. v. FMC,* 475 F.2d 1332 (D.C.Cir.1973). The Commission itself remarked that capacity limitations would prevail "until such time as operational circumstances are shown to necessitate a different level of service." All the Commission has done, in effect, is to require further approval should Dart decide to expand its capacity.

For the reasons stated, we affirm the order of the Commission approving Dart's proposed amendment of its Agreement and imposing tonnage limitations as a condition to that approval.

*Judgment Accordingly.*